## UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

In re:                                        Chapter 11

Michigan Sporting Goods
Distributors, Inc.,                           Bankruptcy Case No.: 17-00612-jtg


                        Debtor.        Hon. John T. Gregg
_____/

## DECLARATION OF BRUCE ULLERY
## IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS

I, Bruce Ullery, declare under penalty of perjury under 28 U.S.C. § 1746 as

follows:

1.      I am the President and Chief Executive Officer of Debtor Michigan

Sporting Goods Distributors, Inc.[1] ("**Debtor**").  Debtor has authorized me to submit this

Declaration on its behalf.

2.      I am submitting this Declaration to  explain  the circumstances that led to

Debtor's bankruptcy filing, and in support of Debtor's petition under Chapter 11 of the

bankruptcy code ("**Bankruptcy Code**") and the motions filed  along with Debtor's petition

(collectively, the "**First Day Motions**").

3.      The facts set forth in this Declaration are based upon my personal

knowledge, my discussions with Debtor's senior management team, documents I have reviewed,

and my nearly 28 years of experience as the Debtor's president and chief executive officer.   If

asked to do so, I would provide testimony as to the facts set forth in this Declaration.

---

[1] Debtor does business under the following trade names: Traverse Bay Tackle, MC Sports, MC Sporting Goods, MC, and MC Sports Outdoor Center.

## BACKGROUND

**Debtor's Business Operations**

4.      Founded in 1946, Debtor is a retail sporting goods chain headquartered in Grand Rapids, Michigan, offering a broad range of sporting and outdoor products, including apparel and sporting equipment from Nike, Under Armor, Burton, K2 Sports, Columbia, and Adidas.

5.      Debtor employs over 1,300 full and part-time associates and operates 68 stores throughout the Midwest.  Debtor's distribution center and corporate offices are located at 3070 Shaffer Avenue, Grand Rapids, Michigan, 49512.[2]

6.      Debtor's operations generate over $170 million in annual revenues.  As of February 14, 2017, Debtor's preliminary consolidated financial statements reflected approximately $78 million in assets, including inventory valued at $62 million.  As of February 14, 2017, Debtor recorded in FYE2016, sales of approximately $174.6 million, net losses, before taxes, of approximately $5.4 million.

### Capital Structure

7.      I own approximately 86% of the equity in Debtor.  The balance of the equity is held by Debtor's executive management team, including district and corporate managers.

8.      Wells Fargo Bank ("**Wells**") is Debtor's lender under an Amended and Restated Credit Agreement, dated as of August 26, 2010 (as amended from time to time, the "**ABL Credit Agreement**"), providing up to $75,000,000 million in aggregate loans under an asset-based revolving credit facility (the "**ABL Loan**").  The ABL Credit Agreement provides

---

[2]  Debtor operates retail stores in Iowa, Illinois, Indiana, Michigan, Missouri, Ohio, and Wisconsin.

for a varying interest rate based upon the excess availability under the ABL Loan.  Availability under the ABL Loan is limited by a borrowing base calculation.

9.      Debtor's obligations to Wells under the ABL Credit Agreement are secured by a first-priority security interest in and lien on substantially all of Debtor's assets.  As of the Petition Date, Debtors has drawn approximately $49,350,000 in principal on the ABL Loan.

**Trade Debt and Lease Obligations.**

10.      In the ordinary course of business, the Debtor orders and purchases inventory from vendors and suppliers on standard industry credit terms.

11.      Debtor purchases all inventory that it sells. None of Debtor's inventory is consigned inventory.

12.      As of the Petition Date, the Debtor owed approximately $27.6 million in trade and other unsecured obligations to vendors, suppliers, and other ordinary course contractors.  Given the seasonal timing of Debtor's inventory purchases, and because Debtor has been on credit hold with many vendors,  Debtor does not anticipate that there will be a material amount of 503(b)(9) or reclamation claims.

13.      The Debtor owns no real estate.  Debtor leases all of its retail store locations, its distribution center and its corporate offices.   Debtor's monthly lease obligations (excluding CAM, insurance, and taxes) total approximately $1,200,000.

**Circumstances Leading to this Filing**

14.      Debtor's business operations, like many of its peers in the sporting goods retail space, has been impacted by adverse business trends, including the rapid migration of sales

from traditional brick and mortar retailers to online resellers, the expansion of competing

distribution channels and specialty retailers, and changing consumer preferences.

15.    Over the past four years, in response to these and other marketplace

pressures, MC Sports has made substantial investments in its store portfolio, opening new stores

and remodeling, expanding or relocating existing stores, and evolving, in many cases, from

smaller athletic stores to larger full-line stores that offer a full range of sports and outdoor

products.

16.    In the fall of 2016, in a continuing effort to improve Debtor's financial

performance, Debtor engaged Berkeley Research Group ("BRG") to evaluate the Debtor's

inventory management processes and develop strategies to improve and optimize inventory turns

and margins, to rationalize Debtor's store base, and explore additional cost savings initiatives

and efficiencies.

17.    Weak "Black Friday" and holiday sales, however, resulted in further

impairment of Debtor's liquidity and as a result, the Debtor and its professionals entered into

negotiations with an ad hoc committee of trade vendors and other key creditor constituencies,

including its landlords, for financial concessions, all with a view to addressing Debtor's liquidity

restraints and reaching a consensual and out-of-court financial restructuring.

18.    Notwithstanding the good faith attempts of the ad hoc committee and

other creditor stakeholders, however, the Debtor was ultimately unable to finalize a

comprehensive and workable restructuring plan, leading to the filing of this bankruptcy case.

19.    As set forth in more detail below, in consultation with BRG and in its

carefully considered business judgment, Debtor determined it was in its best interest, as well as

its creditors, to commence with an immediate liquidation of Debtor's business.

4

**FIRST DAY MOTIONS**

20.    In addition to the Petition, Debtor filed so-called "First Day" motions designed to minimize the adverse effects bankruptcy will have on Debtor's business and employees, including the following:

a.    Debtor's Motion for An Order Authorizing Debtor to Pay Pre-Petition Wages and Salaries and to Pay and Honor Certain Pre-Petition Employee Benefits and Related Obligations ("**Employee Wages Motion**");

b.    Debtor's Motion for An Order (A) Authorizing the Use of Cash Collateral; and (B) Granting Adequate Protection and Related Relief; and (C) Scheduling a Final Hearing on the Motion ("**Cash Collateral Motion**");

c.    Debtor's Motion for an Order Authorizing the Continued Use of Its Existing Cash Management System, Bank Accounts, and Business Forms ("**Cash Management Motion**");

d.    Debtor's Motion for An Order (A) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services to Debtor; and (B) Approving Debtor's Proposed Procedures for Resolving Adequate Assurance Requests ("**Utilities Motion**");

e.    Debtor's Motion for An Order Authorizing It to Maintain and Continue Its Insurance Programs and Pay Any Related Pre-Petition Obligations ("**Insurance Motion**");

f.    Debtor's Motion for An Order (A) Authorizing Debtor to Remit and Pay Sales and Use Taxes and Similar Taxes as well as Fees, Licenses, and Similar Charges and (B) Authorizing Banks and Other Financial Institutions to Receive, Process, Honor, and Pay Checks Issued and Electronic Payment Requests Made Relating to the Foregoing ("**Tax Payment Motion**");

g.    Debtor's Motion for An Order Authorizing Maintenance, Administration, and Continuation of Certain Customer Programs ("**Customer Program Motion**");

h.    Debtor's Motion for Entry of an Order Establishing Procedures for the Rejection of Executory Contracts and Unexpired Leases ("**Lease Procedure Motion**");

i.    Debtor's First Omnibus Motion to Entry of an Order Rejecting Certain Unexpired Leases ("**Lease Rejection Motion**");

j.    Debtor's Motion for Interim and Final Orders (A) Authorizing Debtor to Assume the Consulting Agreement with Tiger Capital Group, LLC and Great American Group, LLC; (B) Authorizing and Approving Store Closing Sales Free and Clear of All Liens, Claims, and Encumbrances; and (C) Granting Related Relief ("**Sales Motion**");

k.    Debtor's Motion for an Order Establishing Certain Notice, Case Management and Administrative Procedures;

l.    Debtor's Motion for an Order Extending the Deadline for Filing Its Schedules and Statements of Financial Affairs;

m.    Debtor's *Ex Parte* Motion for an Emergency Hearing on its First Day Motions; and

n.    Debtor's *Ex Parte* Motion for Entry of a Definitive Order.

21.    I have reviewed each motions listed above.  To the best of my knowledge, the facts stated in the motions are true and correct.  Some the factual allegations are based on information I have been given by Debtor's senior management team, but to the best of my knowledge, that information is true and correct.  I also believe that the relief requested in the motions is necessary, appropriate, and in the best interest of Debtors' estate, creditors, and other parties-in-interest.

**A.    Employee Wage Motion**

22.    Debtor pays salaries and wages to its employees ("**Prepetition Compensation**") and, as detailed below, Debtor also generally participates in or is obligated to its employees under several benefit programs and plans, and provides medical, dental, and related benefits to its employees ("**Prepetition Benefits**").

23.     As detailed below, employees and third party administrators and other parties are owed various pre-petition payments and benefits under these programs and plans that were unpaid as of the Petition Date.

**Prepetition Compensation**

24.     The Prepetition Compensation consists of the following:

*Salaries and Wages*

25.     Debtor owes its employees Prepetition Compensation, possibly including overtime.

26.     Automatic Data Processing, Inc. ("**ADP**"), processes Debtor's payroll, creating on a bi-weekly basis a direct deposit detail file and check issue file which are transmitted to Fifth Third Bank.  Fifth Third Bank funds direct deposits and issues checks to Debtor's employees from a payroll account Debtor maintains with Fifth Third.   ADP is paid monthly, quarterly and annual administrative fees that total approximately $5,000.00 per month, with approximately $1,600 in pre-petition fees currently due and owing. As of the Petition Date, salaries and wages have accrued for pre-petition services for the ten day "stub" period preceding the Petition Date.   Debtor believes that the aggregate gross salaries and wages that have accrued, but have not yet been paid, are approximately $844,000.  No employee has any outstanding pre-petition claim for gross salary totaling more than approximately $6,200.

*Withholdings*

27.     Included in the payroll amounts described above are funds Debtor withholds for the benefit of third parties, including federal, state, and local taxes, medical and health deductions, and other withholdings employees request or federal, state, and local law

requires Debtor pays all payroll, income tax withholdings and third party deductions directly to federal, state and local agencies.

*401(k) Plan*

28.     Debtor sponsors and administers a 401(k) savings plan ("**401(k) Plan**") for employees that are (1) at least 18 years old; (2) have one year of continuous service with Debtor; and (3) have worked at least 1,000 hours in their first year or service or any calendar year thereafter. An employee's enrollment is automatic after becoming eligible.

29.     Under the 401(k) Plan, Debtor withholds, at an eligible employee's request, up to 100% of such employee's annual, pre-tax pay for contribution to the 401(k) Plan, subject to applicable limitations imposed by the Internal Revenue Code.

30.     Prior to January 1, 2017, Debtor maintained a 401(k) matching plan. Debtor matched 25% of employees' contributions, up to 6% of such employees' salary, with Debtor's contribution fully vesting after 6 years in accordance with Debtor's 401(k) vesting schedule. Debtor suspended its 401(k) matching program effective January 1, 2017. Debtor has not funded the matching contribution for 2016 it owes to 503 of its employees, which totals approximately $150,000.

31.     Mass Mutual administers and manages the 401(k) Plan and investment plans. On each pay day, Mass Mutual withdraws the appropriate funds from Debtor's general operating account at Fifth Third Bank.

*Expense Reimbursement*

32.     In the ordinary course of business, Debtor reimburses employees for out-of-pocket expenses attributable to their employment, including mileage allowances. Employees are required to submit expense reimbursement forms and copies of receipts for review and approval.

8

33.    As of the Petition Date, some employees may not yet have submitted expense reimbursement requests, or requests may have been submitted, but not yet processed. Debtor estimates that the amount of expenses accrued prior to the Petition Date and submitted for reimbursed but not yet paid should not exceed $3,000.

**Prepetition Benefits**

34.    The Prepetition Benefits consist of the following:

*Holidays, Sick, Personal, and Vacation Days*

35.    Employees are eligible for six paid holidays per year, up to two paid personal days, and up to 160 hours of paid vacation time, which accrue as of an employee's anniversary date with Debtor, subject to the limitations set forth in Debtor's employment policy. These accrued holiday, sick, personal, and vacation days may be used in accordance with Debtor's employee policy. Employees are not compensated for unused holidays, personal or sick days. Accrued unused vacation time is paid to an employee in the event of termination. As of the Petition Date, approximately $614,000 in vacation time has accrued and is unused.

*Employee Insurance Plans and Programs*

36.    Debtor offers various employee insurance plans and programs. For instance, when a full-time employee has been employed for 90 days, the employee is enrolled in medical insurance benefits (the "**Medical Plan**") through Blue Cross Blue Shield of Michigan ("**Blue Cross**"); and preventive, basic, and major dental coverage (the "**Dental Plan**") through Delta Dental of Michigan.

*The Medical Plan*

37.    The Medical Plan is administered by Blue Cross, but is self-funded. Debtor pays approximately $148,000 per month to fund the Medical Plan. In addition, Debtor

pays Blue Cross administrative fees of approximately $21,000 per month, broker fees of approximately $2,700 per month, and pays approximately $32,000 per month for stop loss insurance coverage.

38.     Coverages under the Medical Plan include: (a) preventive care covered at 100% for in-network providers; (b) deductibles of $4,000 per person and $8,000 per family; (c) 100 percent prescription drug coverage after deductible is met; and (d) the ability to participate in health savings accounts ("**HSA Accounts**") funded through pre-tax earnings.

39.     Many employees electing coverage under the Medical Plan have opened up HSA Accounts.  Several employees voluntarily fund their HSA accounts through payroll deductions. In addition, Debtor contributes $500 per individual and $1,000 per family annually into all employees' HSA Accounts.  Employee contributions are made each payroll cycle, with Debtor's contributions made on a quarterly basis.  Debtor's next contribution of $45,000 is due in March 2017 for the approximately 240 employees that maintain an HSA account.

*The Dental Plan*

40.     The Dental Plan provides for 50% coinsurance for most dental procedures, including orthodontic procedures. The Dental Plan has a $1,000 in- and out-of-network maximum, but no deductible.

41.     Debtor pays Delta Dental of Michigan approximately $5,900 per month in premiums under the Dental Plan, with its employees paying the remaining portion of the premiums.

*Additional Insurance Plans*

42.     Debtor allows eligible employees to purchase additional insurance, including vision, supplemental life, spouse supplemental life, child supplemental life, accident,

10

critical illness, individual short term disability, and hospital indemnity, through CIGNA. The premiums for any additional insurance coverage an employee may elect to carry is withheld from paychecks and paid over to CIGNA on a monthly basis.

43.     Under Michigan law, Debtor is required to provide workers' compensation coverage ("**Workers' Comp Plan**") for its employees for injuries occurring in the course of their employment. In connection with the Workers' Comp Plan, Debtor maintains workers compensation policy with Secura at the cost of approximately $17,000 per month.

*COBRA*

44.     Pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("**COBRA**"), Debtor offers eligible former employees the opportunity to continue insurance coverage under then-existing medical and dental plans. Eligible former employees who elect to participate in COBRA are entitled by law to insurance coverage for up to 18, 29, or 36 months.

45.     Three former employees currently receive COBRA benefits. Debtor pays amounts due for COBRA coverage on a monthly basis and is reimbursed by the employees on a monthly basis.

46.     Obligations under COBRA are approximately $340 per month per employee for medical coverage. As of the Petition Date, Debtor does not believe it has any unpaid COBRA obligations.

*Other Benefits*

47.     Debtor also provides eligible employees with various other benefits that may have accrued prior to the Petition Date but have not yet been paid. Such benefits might include paid time off for jury duty, military leave, and bereavement. As of the Petition Date, Debtor does not believe that it owes any amounts for such other benefits.

11

**B.    Cash Management Motion**

48.    Debtor maintains a centralized cash management system in the ordinary course of its business (the "**Cash Management System**").  The Cash Management System allows Debtor to efficiently collect, transfer and disburse cash generated at Debtor's retail stores and is critical to maintain the efficient operation of Debtor's business and to maximize the value of Debtor's assets.

49.    The Cash Management System operates through funding accounts, collections accounts, or controlled disbursement accounts, which Debtor maintains at the banks and financial institutions set forth in Exhibit A to the Cash Management Motion.

50.    In the ordinary course of Debtor's business, all collections from retail sales at Debtor's stores are deposited into one of the approximately 22 store accounts maintained at the Banks. The balances in all of these accounts are then transferred daily by ACH into a cash collateral account at Fifth Third Bank, which is subsequently swept to a Wells Fargo account.

51.    As needed, and to the extent of availability, Debtor borrows under Debtor's revolving line of credit with Wells Fargo to fund, through zero balance transfers, controlled disbursements accounts at Fifth Third Bank, including payroll, taxes, and accounts payable.

52.    All of the Banks are well-known banking institutions and are insured with the Federal Deposit Insurance Corporation.

53.    A flow chart summarizing the cash flows from Debtor's operations is attached as Exhibit B to the Cash Management Motion, and further set forth in the proposed Interim Order attached to the Cash Collateral Motion (discussed in more detail below).

## C.     Cash Collateral Motion

54.     In connection with the bankruptcy filing, Debtor seeks entry of an Interim Order authorizing it to use certain cash collateral and granting certain pre-petition secured creditors ("**Interim Cash Collateral Order**").  This Interim Cash Collateral Order is attached to the Cash Collateral Motion.  I have reviewed both the Cash Collateral Motion and Interim Cash Collateral Motion.  All representations and facts set forth in the Cash Collateral Motion and Interim Cash Collateral Motion are true and correct to the best of my knowledge.  Further, Debtor considered the terms and, in consultation with BRG, concluded in its business judgment that agreement to and seeking entry of the Interim Cash Collateral Order was and is in the best interest of Debtor and its creditors.

## D.     Utilities Motion

55.     To operate its business, Debtor obtains electricity, natural gas, telephone, water, waste disposal, and other similar services (collectively, the "**Utility Services**") from multiple utility companies or brokers (collectively, the "**Utility Companies**").  A nonexclusive list of the Utility Companies that provide Utility Services to Debtor as of the Petition Date (the "**Utility Services List**") is attached as Exhibit A to the Utilities Motion.

56.     Uninterrupted Utility Services are essential to Debtor's ongoing business operations and the success of this case.  If any Utility Provider were to refuse, alter, or discontinue service, even for a brief period, Debtor's business operations would be severely disrupted.  Accordingly, it is critical that the Utility Services continue uninterrupted during this case.

57.     On average, Debtor pays approximately $280,000 each month for Utility Services in the operation of Debtor's stores, corporate offices, and distribution center.  The Utility Companies hold approximately $14,688 in deposits from Debtor.

**E.     Insurance Motion**

58.     In the ordinary course of business, Debtor maintains multiple insurance policies covering liabilities and losses related to the Debtors' property and business, including coverage for property, workers compensation, director and officer liability, casualty, cyber security, and life insurance for key executives (collectively, the "**Insurance Policies**").  The amounts and types of coverage are typical of coverages maintained by comparably sized retail operations and comport with both state and local laws governing the jurisdictions in which the Debtor operates and contractual obligations under various agreements between Debtor and third parties.

59.     A list of the Insurance Policies, including the carrier, the broker, the last four digits of the policy number, the policy limits, the annual premium, and an estimate of prepetition amounts owed, if applicable, is attached as Exhibit A to the Insurance Motion.

60.     Debtor employs Van Wyk Risk Solutions ("**Van Wyk**") as its insurance broker to assist Debtor with the negotiation and purchase of certain of the Insurance Policies. Van Wyk is compensated on a flat fee basis for its services, and Debtor believes that there are no outstanding prepetition amounts due and owing Van Wyk.

61.     Further, Debtor does not believe there are any outstanding prepetition amounts for unpaid premiums due under any of the Insurance Policies.

14

**F.     Tax Payment Motion**

        62.     In the ordinary course of business, Debtor (a) incurs taxes, including, but not limited to, use, business, and franchise taxes, (b) collects sales taxes from its customers, and (c) is charged fees, licenses, and other similar charges and assessments (collectively, the "**Taxes and Fees**"). Debtor remits such Taxes and Fees to various federal, state, and local taxing and other governmental authorities and/or certain municipal or governmental subdivisions or agencies of those states (the "**Taxing Authorities**"). The Taxes and Fees are paid monthly, quarterly, semi-annually, or annually to the respective Taxing Authorities.

        63.     Debtor requests Court approval to pay the pre-petition Taxes and Fees that may be owing to avoid the disruption to its chapter 11 case, which would result from the nonpayment of such items, including the distractions that could result from liability for nonpayment imposed upon Debtor's officers and directors.

        64.     I believe that payment of the Taxes and Fees is in the best interest of Debtor and its estate, will not harm unsecured creditors, and may reduce harm and administrative expense to Debtor's estate.

**G.     Customer Program Motion**

        65.     Maintaining the loyalty, support, and goodwill of Debtor's customers is essential to Debtor's reorganization efforts. In short, Debtor must maintain positive customer relationships and a reputation for fairness to ensure that Debtor's customers continue to buy goods at Debtor's stores.

        66.     In the ordinary course of its business, Debtor provides customers with certain Customer Programs to encourage customer loyalty and goodwill, and to increase Debtor's sales opportunities. Debtor's Customer Programs include loyalty programs, gift cards,

coupons, various promotional offers, and refunds and exchanges, as well as processing customer purchases through the use of credit cards (the "**Customer Programs**").

67.     Debtor believes that its ability to continue certain Customer Programs is necessary to retain its reputation for fair dealing, to address competitive market forces, maintain positive customer relationships, and ultimately, to maximize product sales—increasing revenue and profitability that ultimately benefits all of Debtor's stakeholders.

68.     Prior to the Petition Date, the Debtor sold gift cards ("**Gift Cards**"), in the ordinary course of business in varying amounts.  Currently, approximately $2,000,000 in Gift Cards remain outstanding.

69.     Debtor requests authority, in its sole discretion, (a) to honor all Gift Cards purchased prior to the Petition Date and (b) to pay any prepetition processing fees or allow Gift Card vendors to set off commissions in the ordinary course of business.  Debtor will not continue selling Gift Cards post-petition.

70.     Prior to the Petition Date and subject to certain exceptions, Debtor generally accepted from its customers merchandise returns and exchanges (the "**Refund and Exchange Program**"). Items that meet certain conditions may be returned for the same form of payment originally used for the purchase.  Under the Refund and Exchange Program, Debtor accepted returns and exchanges up to 30 days after merchandise item was sold, provided the terms and conditions set forth in the Refund and Exchange Program were otherwise adhered to.

71.     Debtor request authority to continue its Refund and Exchange Program, and accept the return of merchandise purchased prior to the Petition Date, except the period for accepting returns will be shortened from 30 days to 15 days.

16

72.     Debtor is unable to estimate the value of its prepetition obligations under the Refund and Exchange Program because returns and exchanges can be made for up to 30 days from the original sale date.

73.     Prior to the Petition Date, Debtor offered various in-store and online promotional offers to customers (collectively, the "**Promotions**"). The Promotions are intended to drive sales, maintain market competitiveness, and build brand loyalty. The Promotions provide discounts to customers, such as "percentage off" and "buy-one-get-one-free," as well as provide customers in Debtor's ActiveRewards program with a $15 gift certificate for every $500 the customer spends.  The Promotions are similar to those routinely offered in the retail industry.

74.     Debtor requests authority to honor all prepetition gift certificates that were issued in accordance with Debtor's ActiveRewards program.

75.     Debtor accepts several methods of payment from customers at the point of sale, including credit card and checks.  For all methods of payment (other than a cash transaction), Debtor receives the net customer sales less any chargebacks, returns and processing fees charged. The processing fees charged by each company vary, but are generally in the range of 1% to 4%. The fees that are owing to these companies are set off from the funds that are remitted to Debtor on a weekly basis.

76.     Maintaining use of the credit cards and other payment mechanisms is essential to the continuing operation of Debtor's business because a significant amount of the Debtor's sales are not cash sales.

**H.     Lease Procedures Motion and Lease Rejection Motion**

77.     As noted above, Debtor leases real property in Iowa, Illinois, Indiana, Michigan, Missouri, Ohio, and Wisconsin in connection with Debtor's operation of Debtor's 68

17

retail stores.  Debtor also leases its distribution and corporate headquarters in Grand Rapids, Michigan.

78.    To preserve and maximize the value of the bankruptcy estate, Debtor may decide during the course of this case and in the exercise of its business judgment, that certain leases should be rejected to avoid rent and other expenses attendant to those leases. The prompt rejection of leases that Debtor determines no longer benefit the bankruptcy estate will maximize the value of the bankruptcy estate.

79.    By the Lease Procedures Motion, Debtor requests that the Court enter an order approving procedures for the rejection of executory contracts and unexpired leases throughout this case, and granting Debtor authority to take all actions necessary to implement such procedures, including abandonment of the Remaining Property (defined below).

80.    Further, Debtor has already ceased or will cease operating at the following stores (the "**Closed Stores**"):

| Store No. | Store Name | Store Address | Date Closed |
|---|---|---|---|
| 166 | Jefferson City, MO | Wildwood Crossing Shopping Center, 3535 Missouri Blvd., Ste. 123, Jefferson City, MO | 1/31/2017 |
| 196 | Marysville, OH | Coleman's Crossing, 730 Coleman's Crossing Blvd., Marysville, OH | 1/31/2017 |
| 193 | Muncie, IN | Muncie Towne Center, 940 East Princeton Ave., Muncie, IN | 2/28/2017 |
| 181 | Piqua, OH | Miami Valley Crossing, 1266 East Ash Street, Piqua, OH | 2/28/2017 |
| 195 | Wadsworth, OH | Wadsworth Crossing, 1048 Williams Reserve Blvd., Marysville, OH | 1/31/2017 |
| 149 | Wooster, OH | Wooster Place Plaza, 3749 Burbank Road, Wooster, OH | 2/28/2017 |
| 201 | Anderson, IN | Southtown Center, 4532 Scatterfield Road, Anderson, IN | 10/1/2016 |

By the Lease Rejection Motion, Debtor requests that the Court authorize Debtor to reject the leases (and any modifications, amendments, addenda, supplements, or restatements thereof) covering the Closed Stores (the "**Rejected Leases**") effective as of the dates set forth in the Lease Rejection Motion and grant Debtor authority to abandon the Remaining Property (defined below), if any, located at the Closed Stores.

81.     Absent the relief requested in both the Lease Procedures Motion and the Lease Rejection Motion, Debtor may continue to be obligated to pay rent or other charges in respect of leases, even when Debtor is no longer operating in those stores and may have no other productive uses for the premises.  The prompt rejection of these leases will reduce Debtor's expenses and maximize the value of Debtor's estate.

82.     Further, to the extent any personal property, furniture, trade fixtures, and equipment owned by the Debtor (the "**Remaining Property**") remains on the leased premises, Debtor requests that such Remaining Property be deemed abandoned.  The Remaining Property is either burdensome to the estate as the costs associated with removal and storage of this property is likely to exceed any net proceeds from the property or is of inconsequential value and benefit to the estate.

83.     I believe the procedures set forth in the Lease Procedures Motion, rejecting the Rejected Leases, and abandoning the Remaining Property is in the best interest of Debtor and its estate, will not harm unsecured creditors, and may reduce harm and administrative expense to Debtor's estate.

19

## I.    Sales Motion

84.    Having decided that a restructuring plan is not feasible, Debtor—in consultation with BRG—determined it was in Debtor and its creditors' best interest to proceed with an orderly liquidation of its 68 stores.

85.    Debtor retained Tiger Capital Group, LLC ("**Tiger**") and Great American Group, LLC (collectively, the "**Consultant**") pursuant to the terms of the Consulting Agreement executed on February 13, 2017 (the "**Consulting Agreement**"), to oversee and manage the Store Closing Sales.  Consultant is a nationally recognized liquidator and is one of only a very few companies that are capable of conducting an orderly liquidation of this scope and magnitude.

86.    Consultant has extensive expertise in conducting retail store closing sales, including the orderly liquidation of inventory (the "**Merchandise**") and certain furniture, fixtures, equipment and other assets that Debtor owns (the "**FF&E**", and collectively with the Merchandise, the "**Store Assets**").  In addition, Consultant is already familiar with Debtor's inventory and operations based on its October 2016 appraisal, the pre-petition negotiations and work done with Debtor and BRG, and an appraisal of Debtor's inventory completed on January 28, 2017.

87.    Debtor obtained and considered an unsolicited joint proposal from two other national liquidators, but ultimately concluded that the financial and other terms Consultant proposed—including a "floor" that Consultant would need to attain before receiving a fee for its services (as set forth in more detail below)—were better.

88.    Under the Consulting Agreement, the Consultant will serve as Debtor's exclusive agent for the purpose of conducting the liquidation sales at its 68 retail store locations (the "**Closing Sales**"), including liquidation of the Store Assets, subject to the procedures set

forth in the proposed Interim Order, Final Order, and Sale Guidelines attached to the Sale Motion.

89.    Debtor negotiated the terms and conditions of the Store Closing Agreement in good faith and at arms' length.    Debtor has carefully reviewed and considered the terms of the Consulting Agreement, and respectfully submits that the Consulting Agreement and proposed Closing Sales will maximize the benefit to Debtor's estate.

90.    Debtor and Consultant have begun the process of preparing for the Closing Sales, including (a) determining how to distribute its remaining inventory across its Stores to maximize proceeds realized from the Closing Sales; (b) ordering customized specialty banners and signs to announce the Closing Sales at the Closing Stores; and (c) engaging with Debtor's employees about the Closing Sales  Further, Consultant has worked to familiarize itself with Debtor's operations, the Merchandise, the Stores, and other Store Assets, including completing an inventory appraisal on January 28, 2017.

91.    On February 13, 2017, following the execution of the Consulting Agreement, the Consultant began preparations to officially launch the Closing Sales on February 14, 2017.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  February 14, 2017

Bruce Ullery
President and CEO
Michigan Sporting Goods Distributors, Inc.