**UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**

In re:

MICHIGAN SPORTING GOODS
DISTRIBUTORS, INC.

Debtor.

_____ /

Chapter 11

Bankruptcy Case No.: ___17-00612-jtg___

Hon. ___John T. Gregg___

**DECLARATION OF STEPHEN COULOMBE IN SUPPORT OF DEBTOR'S**
**EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (A) AUTHORIZING**
**DEBTOR TO ASSUME THE CONSULTING AGREEMENT WITH TIGER CAPITAL**
**GROUP, LLC AND GREAT AMERICAN GROUP, LLC; (B) AUTHORIZING AND**
**APPROVING STORE CLOSING SALES FREE AND CLEAR OF ALL**
**LIENS, CLAIMS AND ENCUMBRANCES; AND (C) GRANTING RELATED RELIEF**

I, Stephen Coulombe, declare under penalty of perjury, pursuant to 28 U.S.C. §

1746 of the United States Code, as follows:

1.      Unless otherwise defined in my declaration, capitalized terms have the

meanings given in the Motion (as defined below).

2.      I am a Managing Director of Berkeley Research Group ("**BRG**"). On

November 9, 2016, Michigan Sporting Goods Distributors, Inc.  ("**Debtor**") engaged BRG to

serve as financial advisor.

3.      I have over 20 years of experience serving as a financial advisor and

providing performance improvement services to corporations, creditors, equity owners, directors

and other stakeholders of underperforming companies.

4.      I submit this declaration (this "**Declaration**") in support of *Debtor's*

*Motion for Interim and Final Orders (A) Authorizing Debtor to Assume the Consulting*

*Agreement With Tiger Capital Group, LLC and Great American Group, LLC; (B) Authorizing*

*and Approving Store Closing Sales Free and Clear of All Liens, Claims and Encumbrances; and*
*(C) Granting Related Relief* (the "**Motion**").

      5.      Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of Debtor's operations and financial condition, information I learned from reviewing reports, documents and other information that Debtor's management team and advisors gave me, or is based on my opinion formed from my knowledge and experience or other information I reviewed regarding Debtor's operations and financial condition. I am over eighteen (18) years of age and I am authorized to submit this Declaration on behalf of Debtor. If called upon to testify, I could and would competently testify to the facts set forth in this Declaration and the Motion based upon my own personal knowledge, except as otherwise stated herein.

**A.    Debtor's Store Closing Plan**

      6.      Debtor operates 68 stores operating across the states of Michigan, Illinois, Indiana, Iowa, Missouri, Ohio, and Wisconsin.

      7.      Debtor's business operations, like many of its peers in the sporting goods retail space, have been impacted by adverse business trends, including the rapid migration of sales from traditional brick-and-mortar retailers to online resellers, the expansion of competing distribution channels and specialty retailers, and changing consumer preferences.

      8.      Debtor's engaged BRG in November of 2016 to evaluate Debtor's inventory management processes and develop strategies to improve and optimize inventory turns and margins, to rationalize Debtor's store base, and to explore additional cost savings initiatives and efficiencies.

9.      Weaker than expected 2016 "Black Friday" and holiday sales, however, resulted in further impairment of Debtor's liquidity.  As a result, in December of 2016, Debtor, BRG and other professionals engaged by the Debtor entered into negotiations with an *ad hoc* committee of trade vendors and other key creditor constituencies, including its landlords, for financial concessions, all in an effort to address Debtor's liquidity constraints and reach a consensual, out-of-court financial restructuring.

10.     The ad hoc committee included Adidas, Maurice Sporting Goods, Amer Sports,  Nike, Burton Snowboards, Nordica, Columbia Sportswear Sports,  South Escalade, Under Armour, Golden Viking Sports,  VF Imagewear, Gordini,  VF Outdoor, Icon Health & Fitness, Wolverine World Wide, and Impex.

11.     At the same time, Debtor was negotiating rent deferrals and reductions under the leases Debtor holds for its stores.

12.     Notwithstanding the good faith attempts of the ad hoc committee and other creditor stakeholders to reach an out-of-court accommodation, however, Debtor was ultimately unable to finalize a restructuring plan that Debtor's operations would support.

13.     As a result, Debtor filed with this Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on February 14, 2017 ("**Petition Date**").

14.     Because a going concern restructuring plan is simply not feasible, Debtor—in consultation with BRG—determined that Debtor and its Debtor's stakeholder's interests were best served by proceeding with an orderly liquidation of its 68 stores.

15.     Debtor retained Tiger Capital Group, LLC ("**Tiger**") and Great American Group, LLC (collectively, the "**Consultant**") to assist and facilitate the orderly liquidation of Debtor's store inventory and other assets pursuant to the terms of a Consulting Agreement dated

3

February 13, 2017 (the "**Consulting Agreement**"). Consultant is a nationally recognized liquidator and is one of only a handful of companies capable of conducting an orderly liquidation of this scope and magnitude.

16.     Consultant has extensive expertise in conducting retail store closing sales, including the orderly liquidation of inventory and furniture, fixtures, equipment and other assets. Tiger is already familiar with Debtor's inventory and operations, having performed an appraisal of Debtor's inventory and FF&E as recently as February, 2017.

17.     In addition to Consultant's proposal to manage the liquidation of Debtor' inventory and FF&E, Debtor considered an unsolicited joint proposal from two other national liquidators, but ultimately concluded that the financial and other terms Consultant proposed— including a "floor" that Consultant would need to attain before receiving a fee for its services (described below)—were better.

18.     Under the Consulting Agreement, the Consultant will serve as Debtor's exclusive agent for the purpose of conducting store closing sales at Debtor's 68 retail store locations (the "**Closing Sales**") and will sell all Store Assets, subject to the procedures set forth in the proposed Interim Order and Final Order, and the proposed Sale Guidelines (in each case as defined in the Motion).

19.     Debtor negotiated the terms and conditions of the Consulting Agreement in good faith and at arms' length. The terms set forth in the Consulting Agreement—including Consultant's compensation— are consistent with industry standards. Consultant has extensive experience and resources to effect a large-scale liquidation of Store Assets across Debtor's Stores.

4

20.     Debtor and Consultant have begun the process of preparing for the Closing Sales. That process includes:

- Determining how to distribute Debtor's remaining inventory across its Sores to maximize proceeds realized from the Closing Sales;

- Ordering customized specialty banners and signs to announce the Closing Sales at the Closing Stores;

- Completing an inventory appraisal on February 11, 2017; and

- Engaging with Debtor's employees about the Closing Sales.

**B.     Assumption of the Consulting Agreement on an Interim Basis is in the Best Interests of Debtor**

21.     It is my opinion that liquidating the Store Assets represents the best approach at this time to maximize the return to Debtor's estate for the Store Assets.  I also believe that conducting the Store Closing Sales pursuant to the Consulting Agreement is, at this time, the best alternative to maximize sale proceeds from the liquidation. The terms of the Consulting Agreement are the result of arm's length bargaining, and I believe them to be the best terms available to Debtor.

22.     I understand that the Consultant has extensive experience in conducting liquidation sales and can oversee and assist Debtor to manage and consummate the Closing Sales in an efficient and cost-effective manner.  Moreover, I understand that the Consultant is already familiar with Debtor's business and inventories, given that Debtor and Consultant began to prepare for the Closing Sales prior the Petition Date.

23.     If the Consulting Agreement is not assumed, I believe there will be significant harm to all stakeholders. Debtor's estate will lose the benefit of the Consultant's prepetition relationship with Debtor and the value of the prepetition sales momentum already underway preparing for the Closing Sales.  As such, Debtor would need to suspend the Closing

Sales, conduct a process to find a new Consultant, and start the Closing Sales all over again. I believe that the resulting disruption and delay would lead to a material loss of value and increased administrative expense.

**C.      The Closing Sales Should be Approved on an Interim Basis**

24.     Debtor, in consultation with BRG, has determined that the Closing Sales represent the best way to maximize recoveries to Debtor's estate.  I understand that there are significant Store Assets that I believe will be monetized most efficiently and quickly through an orderly process conducted with the support of an experienced liquidation firm.

25.     I believe that delaying the Closing Sales to identify and retain another liquidator consultant will diminish the recoveries on the Store Assets for several important reasons.  First, I understand that some of Debtor's stores fail to generate positive cash flow and are a significant drain on Debtor's liquidity.  As a result, Debtor will realize an immediate benefit in terms of its liquidity upon the sale of the Store Assets and the termination of operations at these stores.  Second, I understand that allowing the Closing Sales to be officially launched will allow Debtor to vacate the stores of on a rolling basis, reject the applicable leases as the stores become vacant, and avoid the accrual of unnecessary administrative expenses.

26.     On the other hand, any disruption or delay in effecting the Closing Sales, including any delay in the assumption of the Consulting Agreement, will cause Debtor's estate significant and irreparable harm. Debtor is in a difficult financial situation and must maximize sources of liquidity and minimize expenses as much as possible and as quickly as possible.  The Closing Sales will advance both goals. With the assistance of the Consultant, I believe Debtor will be able to liquidate inventory and assets at the Stores and monetize the Store Assets, while eliminating administrative expenses associated with store operations.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed On: 2/14/17

Stephen Coulombe

15455637-1